**Appeal No. 23-1936**
_____

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

_____

DIRECT SUPPLY, INC.,

       Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

       Defendant-Appellee.

_____

On Appeal from the United States District Court
for the Eastern District of Wisconsin, Case No. 2:20-cv-01095-LA
The Honorable Lynn Adelman Presiding

_____

## REPLY BRIEF OF
## PLAINTIFF-APPELLANT

_____

Barry R. White, SBN 1020117
Christopher E. Avallone, SBN 1095465
von Briesen & Roper, s.c.
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
Phone:  (414) 276-1122
Fax:  (414) 276-6281
Email:  Barry.White@vonbriesen.com
      Christopher.Avallone@vonbriesen.com

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

ARGUMENT ................................................................................................ 5

I.   Direct Supply is Entitled to Summary Judgment Under the Plain
     Language of § 199 ............................................................................... 7

     A.   Direct Supply's contracts with providers and suppliers are
          licenses or rentals of DSSI. .......................................................... 8

          1.   Rules of statutory construction do not apply. .............................. 10

          2.   Legislative history is irrelevant. ................................................... 12

     B.   Direct Supply has not made dispositive admissions that it derives
          revenue from services ................................................................... 14

     C.   The structure of Direct Supply's license or rental contracts –
          which requires use of DSSI and necessarily results in revenue –
          is the reason Direct Supply derives gross receipts from its
          licenses or rentals of DSSI. ......................................................... 18

     D.   If the United States is correct that the proper inquiry is why
          customers want DSSI or what they are paying for, the United
          States was not entitled to summary judgment. ............................. 21

II.  Direct Supply is Entitled to Summary Judgment Under the
     Third-Party Comparable Exception ..................................................... 24

     A.   Direct Supply derives gross receipts from providing access
          to DSSI ........................................................................................ 25

     B.   Others derive gross receipts from providing substantially
          identical software on a disk or by download; alternatively,
          genuine issues of fact preclude summary judgment in favor
          of the United States on this issue ................................................ 27

     C.   If the United States is correct that the proper inquiry is
          whether customers are paying for services versus access to
          software, the United States was not entitled to summary
          judgment ..................................................................................... 32

CONCLUSION ........................................................................................... 33

CERTIFICATE OF COMPLIANCE WITH Fed. R. App. P. 32(A)(7),
     Fed. R. App. P. 32(G) AND CIRCUIT RULE 32(C) ..................................... 34

CERTIFICATE OF SERVICE ...................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alex v. City of Chicago,*
  29 F.3d 1235 (7th Cir. 1994) ........................................................ 13

*Atunnise v. Mukasey,*
  523 F.3d 830 (7th Cir. 2008) ........................................................ 12

*Babb v. Wilkie,*
  589 U.S. --, 140 S. Ct. 1168 (2020) ............................................. 11

*Busse v. C.I.R.,*
  479 F.2d 1147 (7th Cir. 1973) ..................................................... 14

*Citizens Ins. Co. of America v. Wynndalco Enterprises,*
  70 F.4th 987 (7th Cir. 2023) ........................................................ 11

*Comdisco Inc. v. U.S.,*
  756 F.2d 569 (7th Cir. 1985) ........................................................ 18

*Exelon Corporation v. Commissioner of Internal Revenue,*
  906 F. 3rd 513 (7th Cir. 2018) ..................................................... 17

*Harrison v. PPG Industries, Inc.,*
  446 U.S. 578 (1980) ...................................................................... 12

*Houchins v. C.I.R.,*
  79 T.C. 570 (1982) ........................................................................ 17

*K-Mart Corp. v. Cartier, Inc.,*
  486 U.S. 281 (1988) ...................................................................... 14

*Northern Illinois Gas Co. v. U.S.,*
  743 F.2d 539 (7th Cir. 1984) ........................................................ 13

*Oesterreich v. C.I.R.,*
  226 F.2d 798 (10th Cir. 1055) ..................................................... 22

*River Road Hotel Partners, LLC v. Amalgamated Bank,*
  651 F.3d 642 (7th Cir. 2011) .......................................................... 9

*Sanders v. Jackson,*
209 F.3d 998 (7th Cir. 2000) ...................................................... 9

*Smith on Behalf of Smith v. Severn,*
129 F.3d 419, (7th Cir. 1997) ..................................................... 31

*Tourdot v. Rockford Health Plans, Inc.,*
439 F.3d 351 (7th Cir. 2005) ...................................................... 11

*U.S. Miscellaneous Firearms,*
376 F.3d 709 (7th Cir. 2004) ...................................................... 10

*U.S. v. LaFaive,*
618 F.3d 613 (7th Cir. 2010) ...................................................... 13

*U.S. v. Marcotte,*
835 F.3d 652 (7th Cir. 2016) ................................................... 7, 10

## Statutes

26 U.S.C. § 199 ........................................................................... 16

## Rules

Fed. R. App. P. 32(A)(7) ............................................................ 34

Fed. R. App. P. 32(f) .................................................................. 34

Fed. R. App. P. 32(G) ................................................................ 34

RULE 32(C) ................................................................................ 34

## Regulations

26 C.F.R. § 1.199-3(i) ................................................................ 16

26 C.F.R. § 1.199-3(i)(4) ................................................. 19, 20, 23

26 C.F.R. § 1.199-3(6)(ii) ........................................................... 25

26 C.F.R. § 1.199-3(6)(iv)(A) ..................................................... 27

## ARGUMENT

The dispositive issues in this case are: 1) under § 199, does Direct Supply derive gross receipts from a license or rental of the DSSI software; and, if not, 2) under the third-party comparable exception, does Direct Supply derive gross receipts from providing access to the DSSI software?

With respect to the statute, the United States relies on rules of construction to argue that DSSI is not licensed or rented because no software physically changes hands, and it relies on the legislative history of the Treasury Regulations to claim that software accessed exclusively online is not licensed or rented within the meaning of § 199. The United States then argues that Direct Supply does not derive revenue from a license or rental of DSSI because:  1) Direct Supply provides other services in connection with DSSI; and 2) Direct Supply admitted in testimony and written communications that customers are paying for a service and not DSSI, all the while ignoring the structure of Direct Supply's transactions with its customers.

With respect to the third-party comparable exception, the United States again ignores the structure of Direct Supply's contracts and argues Direct Supply does not derive gross receipts from providing access to DSSI, and that Direct Supply failed to prove others derive gross receipts from

dispositions of e-procurement software which is "substantially identical" to DSSI.

Running through all of the United States' arguments is its suggestion that whether a taxpayer qualifies for the § 199 deduction can be determined by figuring out if the product in question is a "good" or a "service," rather than by applying the precise language of the statute or regulations. In focusing on a conceptual "goods vs. services" distinction (rather than the actual language), the United States repeats the District Court's flawed analysis by making unsubstantiated assumptions that customers are paying for a service rather than a software product.

The proper focus under the specific language of the statute is whether Direct Supply's contracts are a license or rental of DSSI, and how Direct Supply derives its revenue under those contracts. Under the third-party comparable exception, the proper focus is whether Direct Supply derives gross receipts from providing access to DSSI.

The questions of "why" customers pay for DSSI or "what" customers pay for are not questions that could lead to summary judgment in favor of the United States. There was insufficient evidence to support a finding of why customers want DSSI or what they value for their money (*e.g.*, a procurement service for purchasing products or financial software for controlling spend). Worse yet for summary judgment, if customers are paying for a combination

of the DSSI software and related services, the regulations would require the Court to allocate DPGR between DSSI and those incidental value-added services Direct Supply provides, if that was the dispositive issue.

But that is not the dispositive issue. The dispositive issue is how Direct Supply Inc. derives gross receipts through its contracts with customers who use DSSI or, under the third-party comparable exception, whether Direct Supply derives gross receipts from providing access to DSSI. Largely ignoring that analysis, the United States glosses over the precise statutory and regulatory language and does not discuss the structure of Direct Supply's contracts a single time anywhere in its brief. The structure of Direct Supply's license or rental contracts establishes how Direct Supply generates its revenue from DSSI, and also establishes why revenue necessarily comes from access to DSSI. Those are the reasons the District Court's denial of Direct Supply's motion for summary judgment should be reversed.

## I.     Direct Supply is Entitled to Summary Judgment Under the Plain Language of § 199

"When addressing questions of statutory interpretation, we begin with the text of the statute. When a statute is unambiguous, our inquiry 'starts and stops' with the text." *U.S. v. Marcotte*, 835 F.3d 652, 656 (7th Cir. 2016). Whether Direct Supply is entitled to summary judgment under the plain, unambiguous language of § 199 turns on two questions:

1.     Are Direct Supply's contracts with customers and suppliers "licenses" or "rentals" of DSSI? and

2.     Did Direct Supply derive gross receipts from those licenses or rentals?

Here, the United States largely ignores the specific and unambiguous words in § 199 and, instead, erroneously relies on rules of construction and on the United States' own characterization of the statute (*i.e.,* if the United States can call something a service, that ends the inquiry). Applying rules of construction, the United States argues that software accessed exclusively online cannot be "licensed" or "rented" because both require property to physically change hands. As to the question of whether Direct Supply derives revenue from a license or rental of DSSI, the United States argues that Direct Supply admitted it did not derive revenue from a license or rental of DSSI and then repeats its unsupported conclusion that customers are paying for services, not a software product. Each of these arguments ignores the plain meaning of § 199 and the structure of Direct Supply's contracts.

## A.     Direct Supply's contracts with providers and suppliers are licenses or rentals of DSSI.

Unambiguous statutes are enforced according to their plain meaning. "If we find that the language in a statute is unambiguous, we will not conduct further inquiry into its meaning and enforce the statute in accordance with

its plain meaning." *River Road Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 649 (7th Cir. 2011). This is why Direct Supply's opening brief explained how the dictionary definition of "license" and "rental," as well as usage in the industry, establishes that providing access to the DSSI software is a license or rental. The United States seems to mock Direct Supply's reliance on the plain meaning of the words used, calling it "a strained assembly of dictionary definitions" (USA's Brief at 29), but that is how unambiguous statutes are applied. "We frequently look to dictionaries to determine the plain meaning of words…" *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000).

The United States argues that a license must be more than "granting a customer permission to login to DSSI" (USA's Brief at 52), but never explains how a "true" license is different than Direct Supply's grant of permission to use DSSI. Instead, the United States argues that § 199 requires a product to change hands in order to constitute a license or rental. To make this argument, the United States relies on a rule of statutory construction, e*jusdem generis,* and the history surrounding adoption of the Treasury Regulations. According to the United States, § 199's use of the phrase "other disposition" modifies the definition of "license" or "rental" and means that a license or rental only qualifies for the § 199 deduction if it constitutes a "disposition," and that requires property to physically change hands.

Likewise, the United States says that the history surrounding implementation of the Treasury Regulations establish that software accessed exclusively online can never qualify for the § 199 deduction under the language of the statute but must satisfy the self-comparable or third-party comparable exceptions under the Treasury Regulations. Both of the United States' arguments rely on legal doctrines employed to construe ambiguous statutes. The terms "license" and "rental" are unambiguous and are to be applied as written, not interpreted using rules of construction.

      1.     Rules of statutory construction do not apply.

Before employing canons of construction, the Court must first make a finding that the statute is ambiguous. *U.S. v. Marcotte*, 835 F.3d 652, 656 (7th Cir. 2016) ("The plain and unambiguous language of the statute prevents us from proceeding to consider the other canons of construction"). Ambiguous statutes are those that have more than one reasonable meaning. *U.S. Miscellaneous Firearms*, 376 F.3d 709, 712 (7th Cir. 2004) ("These [two] possible interpretations tell us the statute is ambiguous").

The United States jumps over this crucial first step. The United States never argues that the words "license" or "rental" are ambiguous. The United States never even explains what it contends the words "license" or "rental" mean. It only argues that the Direct Supply's contracts are not a license or rental *as those terms are used in § 199*. To make the argument, the United

States invokes *ejusdem generis* and says, "Because Congress included the phrase "*other* disposition," it follows that Congress intended each of the preceding words to be a type of disposition (or else there would be no need for the word "other")." (USA brief at 53, emphasis original). That is classic statutory construction, and it is only employed where the statute is ambiguous. *Babb v. Wilkie*, 589 U.S. --, 140 S. Ct. 1168, 1177 (2020) ("where, as here, the words of a statute are unambiguous, the judicial inquiry is complete"). Thus, the United States reliance on *ejusdem generis* or any other rule of construction is misplaced, since the United States has not even argued that the statute is ambiguous (much less established it).

> *Ejusdem generis* provides guidance on how to interpret language where meaning is not plain. This Latin phrase confines the scope of a general term to the nature of the preceding class or thing, unless a contrary intent is clearly shown. Since the canon is intended only as an aid to ascertaining the intent of the drafters when uncertainty or ambiguity exists, it applies only when it is not possible to determine the meaning of the words unless one focuses on the context.

*Tourdot v. Rockford Health Plans, Inc.,* 439 F.3d 351, 353-54 (7th Cir. 2005) (citation omitted); *see also Citizens Ins. Co. of America v. Wynndalco Enterprises*, 70 F.4th 987, 999 (7th Cir. 2023) ("…the *ejusdem generis* canon of construction … typically comes into play only if there is some doubt about the meaning of the terms used in the contract or statute"). Without a threshold

finding of ambiguity, the United States' speculation that "… it follows that Congress intended …" is entirely misplaced.[1]  Congress used the words "license" and "rental."  Because those words each have an unambiguous, plain and ordinary meaning, those words are applied as written. *Atunnise v. Mukasey*, 523 F.3d 830, 836 (7th Cir. 2008) (court cannot "ignore the canon that plain and unambiguous statutes must be applied as written"). And as Direct Supply showed in its opening brief, the dictionary definition of those words, case law and expert commentators all agree that providing online access to SaaS (such as DSSI) is a license or rental.[2] (See Direct Supply's Brief 25-30).

> 2.     Legislative history is irrelevant.

Just like *ejusdem generis* and other canons cannot be used to interpret unambiguous statutes, legislative history is irrelevant, too. "We only consider

---

[1] Even if *ejusdem generis* could apply, the United States applies it exactly backwards. "Under the rule of ejusdem generis, where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated." *Harrison v. PPG Industries, Inc.,* 446 U.S. 578, 588 (1980). The United States takes general words ("other disposition") and claims those words change the meaning for the more specific words preceding them.

[2] Without explaining why Direct Supply's permission to use is not a license, the District Court noted that "what Direct Supply describes as "licensing" was nothing more than providing login credentials, which is something that nearly every online service does." (R. 61 at 16; A. Short Appx. 1; citation omitted). The District Court went on the explain no one would contend that revenue earned by an online bank, Amazon.com or an online newspaper were derived from licensing software. The District Court confused the two relevant inquiries. Whether revenue is *derived from* permission to use is a different question. In those examples, the revenue may not be *derived* from a license. But assuredly anyone granted login credentials for online banking, Amazon or a newspaper site has checked a box or clicked "accept" agreeing to terms that constitute a license.

legislative history if the statute contains an ambiguity that the text or structure of the statute cannot resolve." *U.S. v. LaFaive*, 618 F.3d 613, 616 (7th Cir. 2010). As this Court has explained, "[W]hen statutory meaning is clear with respect to the issue at bar judicial inquiry normally should end without heed to the embellishments of secondary materials like legislative history, regulations or administrative rulings." *Alex v. City of Chicago*, 29 F.3d 1235, 1239 (7th Cir. 1994).

Moreover, if the Court considers the legislative history of the Treasury Regulations in interpreting § 199 and accepts the United States' contention that the regulations say "providing access to computer software online, where there is no transfer of the software, is an "online service" that is not a qualifying license…" (USA's Brief at 38), they read new requirements into the statute. Treasury Regulations – like all administrative regulations – are invalid and cannot be sustained if they are plainly inconsistent with the revenue statutes. *Northern Illinois Gas Co. v. U.S.*, 743 F.2d 539, 542 (7th Cir. 1984).

> In determining whether a challenged regulation is valid, a reviewing court must first determine if the regulation is consistent with the statute. If a statute is clear and unambiguous, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.

*K-Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (internal quotation omitted).

That is true whether or not there may be a logical justification for the Treasury Regulation's departure from the statute: "However much the statute, in operation, may offend the Commissioner's sense of symmetry and propriety, … [c]ourts have no power (just as the Commissioner has no power in his capacity as an administrative official) to rewrite legislative enactments..." *Busse v. C.I.R.*, 479 F.2d 1147, 1152 (7th Cir. 1973).

Congress said software manufactured in the U.S. is qualifying production property and gross receipts derived from a license or rental of that software generates domestic production gross receipts. The Commissioner of the Internal Revenue Service has no power to issue regulations that change the law to say *how the software is accessed* changes the plain meaning of "license" or "rental" and changes whether or not the particular software qualifies for the § 199 deduction.

### B.    Direct Supply has not made dispositive admissions that it derives revenue from services

The United States makes two arguments based on supposed admissions by Direct Supply: that Direct Supply employees testified that Direct Supply does not charge for access to DSSI and that Direct Supply's written materials describe DSSI as a "service." Once again, the United

States' argument seeks to avoid a textual application of the statute and instead tries to decide this case based solely on whether the United States can characterize the item being sold as a service. In that regard, the United States argues, "[I]n its communication with customers [Direct Supply] repeatedly characterized the company as providing 'services' rather than 'software';" USA's Brief at 41). How Direct Supply describes DSSI is far from undisputed,[3] and it is not dispositive in any event.

First, Direct Supply employees' testimony is not dispositive on the legal question of how Direct Supply derives receipts from DSSI. Moreover, while the United States accurately quotes Andrew Novotny's deposition testimony, Mr. Novotny also testified as follows:

> Q. By that do you mean that the provider customers don't pay for the right to access DSSI?
>
> A. No.
>
> Q. Why not?
>
> A. Because the fees get passed along. It's just our business model, our financial fee model. They still will get passed along some way, right? The supplier will pass that along, either directly – some suppliers will put DSSI fee on the invoices, or they'll do it through pricing. They'll raise their prices for the products, et cetera.

---

[3] Direct Supply's written materials are full of examples where Direct Supply touts the software-product functionality of DSSI (*e.g.*, "suite of products and features," "reporting and analytical tools," "supplier tools," "look up POs, invoices, and run reports," "core control feature," "innovative data feeds and reporting parameters," "exact month-to-date (MTD) budget status.") (R. 37-4 at 1).

(R. 60-1 at 3-4).

Further, Direct Supply's use of the word "service" in connection with DSSI does not affect a text-based application of the statute. The argument only works if the Court first accepts the United States' characterization of § 199: "If we can call it a service, we don't have to apply the language of the statute to deny the deduction." This goods vs. services distinction as a stand-alone determining factor does not work for software, which is expressly deemed to be qualifying production property under 26 U.S.C. § 199(c)(5), and which always facilitates something else. One can easily characterize software as merely a service that facilitates its end product (*e.g.,* Microsoft's cloud-based Excel provides innumerable arithmetic and formulaic services). That is why the unambiguous language of § 199 is crucial to a proper application of the statute.

More importantly, how Direct Supply describes its transactions (either in testimony or in written materials) matters far less than the actual structure of the transactions themselves. The Treasury Regulations specifically provide "Applicable Federal income tax principles apply to determine whether a transaction is, *in substance*, a lease, rental, license, sale, exchange, or other disposition…" 26 C.F.R. § 1.199-3(i) (emphasis added). And just like the regulations require an inquiry into the substance of the transaction, one of the bedrock "federal income tax principles" is that the

structure of a transaction determines its tax treatment, not the parties' characterization.

For example, as this Court has explained, the "substance over form" doctrine "provides that the tax consequences of transactions are determined based on the underlying substance of the transaction rather than its legal form." In applying this doctrine, the Supreme Court has "looked to the objective economic realities of a transaction rather than the particular form the parties employed," and "has never regarded the simple expedient of drawing up papers as controlling for tax purposes when the objective economic realities are to the contrary." *Exelon Corporation v. Commissioner of Internal Revenue*, 906 F. 3rd 513, 523 (7th Cir. 2018) (citations omitted). Put another way, "the labels, semantic technicalities, and formal written documents do not necessarily control the tax consequences of a given transaction. Rather we are concerned with economic realities and not the form employed by the parties." *Houchins v. C.I.R.*, 79 T.C. 570, 589 (1982).

Far from seeking "to disavow the contractual structure and fundamental nature of its business," as the United States contends (USA's Brief at 48), Direct Supply merely asks the Court to look beyond the words and labels contained in the contract (or worse yet, marketing materials) to analyze the contract's actual structure.

The occasions on which a court may sometimes decide a tax issue based on words used in a transaction do not apply here. As this Court explained in *Comdisco Inc. v. U.S.*, 756 F.2d 569 (7th Cir. 1985):

> The form of the deal usually results in the one party claiming the benefits. If a second party later disavows the form of the deal, the government would be faced with the prospect of having to proceed against both tax payors to resolve who should receive the advantageous treatment … In contrast to the conflicting claims cases, the government will never be faced with conflicting claims [in this case]). We see reason to extend the government's power to hold a taxpayer to the technical form of its transactions to situations in which the government will never face conflicting claims. Therefore, in this case we abandoned the approach that binds a taxpayer to the labels given to a transaction in favor of analysis that looks at the economic substance of a transaction.

*Id*. at 578. Here, there are no conflicting claims for a deduction and all of the authority instructs the Court to look beyond the words in the contract, and, instead, analyze the contract's structure.

### C.     The structure of Direct Supply's license or rental contracts – which requires use of DSSI and necessarily results in revenue – is the reason Direct Supply derives gross receipts from its licenses or rentals of DSSI.

Nothing within the text of § 199 supports the United States' arguments that software accessed online cannot be licensed or rented, or that the question is as simple as whether one can characterize the software as a service. As Direct Supply showed in its opening brief, the dictionary definition of license applies, and case law and expert commentators all agree SaaS (*i.e.*, software accessed online like DSSI) is licensed or rented. (Direct

Supply's Brief at 25-30). Thus, the question under a textual application of § 199 is whether Direct Supply derives revenue from that license or rental.

In that regard, the United States makes two arguments: that Direct Supply's contracts say Direct Supply will provided ancillary implementation and technical support to DSSI customers, and that different customers pay different amounts for their use of DSSI. According to the United States, both of these facts show Direct Supply derives revenue from something other than a license or rental of DSSI. Neither argument is availing.

First, the fact that Direct Supply provides ancillary services in connection with a lease or rental of DSSI does not affect how the revenue is "derived" under Direct Supply's contracts. Those services, in themselves, produce no revenue. Direct Supply does not charge for them. (A.Sep.Appx. 19-20, 22). 95% of Direct Supply's revenue from DSSI comes from the contractual term requiring use of the software, and the other 5% from recurring monthly "maintenance" fees. (A.Sep.Appx. 22). The ancillary implementation and configuration services, in and of themselves, produce literally zero revenue; only the commitment to use DSSI for all of a provider's procurement (and a small amount of maintenance fees) generate 100% of the revenue Direct Supply receives from DSSI.[4]

---

[4] Although the ancillary services generate no revenue in themselves, if the Court concludes Direct Supply derives receipts both from a license or rental of software and the ancillary services, DPGR must be apportioned between the software and the services under 26 C.F.R.

Second, the fact that two different customers pay different amounts based on their use of DSSI actually establishes that Direct Supply's revenue comes from its license or rental of DSSI. Direct Supply's contracts say "During the term of this Agreement, [Provider] and its Facilities will process all or substantially all procurement requirements related to [Provider's] Facilities including the category of food through [DSSI]…" (A.Sep.Appx. 30). Thus, the license or rental contracts require providers to use DSSI for all of their procurement requirements, and they require suppliers to pay Direct Supply based on providers' use. The amount of the fee varies based on the amount of the providers' use, but the fee comes from use – use that is *required* under the license or rental agreements in return for permission to use DSSI. The fact that a provider who uses DSSI more pays more than a provider who uses it less proves that fees come from the permission (and requirement) to use DSSI.

As Direct Supply showed in its opening brief, the common meaning of "derive" is "to take, receive or obtain especially from a specified source." https://www.merriam-webster.com/dictionary/derive (accessed December 4, 2023). Direct Supply receives revenue from DSSI because Direct Supply's license or rental agreements *require* use, and that use under the license or

---

§ 1.199-3(i)(4). The United States summarily dismisses that issue of fact entirely on its contention that, "there was no disposition (i.e., transfer) of software." (USA's Brief at 50).

rental generates Direct Supply's receipts. The terms of the license or rental are what result in revenue. It is the structure of Direct Supply's contracts with its customers – contracts that both permit and require use which guarantees revenue – that insures Direct Supply "derives gross receipts" from the license or rental.

In that regard, Direct Supply's contracts are very different than the examples included in the regulations, and for that reason the examples provide no guidance here. Examples 1 and 2 (banking software and an online auction) are powered by software that has no independent value like DSSI and nothing in the examples suggests that in return for being granted access to the banking or auction software, the customers enter into agreements requiring use and guaranteeing fees *from using the software*. Because the structure of Direct Supply's license or rental agreement guarantees money must be paid to Direct Supply for the right to use DSSI, the revenue is necessarily "received from" the license or rental.

### D.     If the United States is correct that the proper inquiry is why customers want DSSI or what they are paying for, the United States was not entitled to summary judgment.

The structure of Direct Supply's contracts requiring use and fees in return for permission to use the software should resolve whether Direct Supply qualifies for the deduction. However, if the question is what are customers paying for, the customers' intent must be considered. The United

States claims the parties' intent does not matter because the language within the four corners of the contract is conclusive. (USA's brief at 49). That may be a correct recitation of the law of contract interpretation, but it misstates tax law if the question is what are customers paying for.

> [T]he test should not be what the parties call the transaction nor even what they may mistakenly believe to be the name of such transaction. What the parties believe the legal effect of such a transaction to be should be the criterion. … We must look, therefore, to the intent of the parties in terms of what they intended to happen.

*Oesterreich v. C.I.R.,* 226 F.2d 798, 801-02 (10th Cir. 1955).

Certain e-procurement software customers exist who want stand-alone e-procurement software that they can load onto their networks rather than accessing that software online. (A.Sep.Appx. 49-50). The United States admitted that such e-procurement software platforms exist and that they are substantially identical to DSSI *(i.e.,* have the same features and produce the same results). (A.Sep.Appx. 161-63). By loading the software on to their own networks, those customers want – and pay for – e-procurement software for its own sake. Because that software does exactly the same thing DSSI does, it stands to reason that some or most customers of DSSI likewise want a software product, not just some ancillary services. It makes no sense to assume customers who download e-procurement software to manage and control their spend are paying for a software product, but customers who

access identical software online only want a buying service and are not
interested in the software itself or how the software has features to control
spend.

There was very little evidence presented in the District Court as to why
customers want DSSI or what they are willing to pay for – certainly no
evidence from customers of DSSI. What little evidence there was came from
Andrew Novotny who said:

> The value DSSI provides to health care providers, and the reason
> they want DSSI, has little to do with merely buying products.
> Providers can buy products any number of ways without using
> DSSI (e.g., at the store, on Amazon, through the mail using
> paper). The value DSSI provides is how it transforms the buying
> process for nursing home and health care providers.

> (A.Sep.Appx. 33).

If the question is whether DSSI customers want a finance-based
computer software product, or they want a procurement service, there was
insufficient evidence to grant the United States' motion for summary
judgment, and the District Court's decision should be reversed.

Likewise, if customers are paying for both software and other ancillary
services, the court must allocate DPGR between the software product and the
ancillary services. 26 C.F.R. § 1.199-3(i)(4) provides:

> In the case of an embedded service, that is, a service the price of
> which, in the normal course of the taxpayer's business, is not
> separately stated from the amount charged for the lease, rental,
> license, sale, exchange, or other disposition of QPP, a qualified

film, or utilities, DPGR include only the gross receipts derived from the lease, rental, license, sale, exchange, or other disposition of QPP, a qualified film, or utilities (assuming all the other requirements of this section are met) and not any receipts attributable to the embedded service.

The United States' only argument on this point is that it does not apply because there is no disposition of software. As repeatedly shown, Direct Supply's contracts are a license or rental. And the "services" the United States points to are those things that make DSSI work (*e.g.*, setting up a customer-specific portal and loading the customer-selected products into the customer-specific catalog, and letting the software's functionality take over from there). One can hardly imagine what could be more "embedded" than the simple implementation and configuration efforts that allow the DSSI software to do what it does: analyze and control providers' spend, collect data, insure compliance and generate reports.

## II.   Direct Supply is Entitled to Summary Judgment Under the Third-Party Comparable Exception

Separate from its entitlement to summary judgment under the plain language of § 199, Direct Supply is also entitled to summary judgment under the third-party comparable exception. That exception assumes DSSI is "online services." It requires that Direct Supply derives gross receipts from providing access to DSSI, and that others derive gross receipts from a license of substantially identical software made available on a disk or by download.

The United States contends Direct Supply derives no gross receipts from providing access to DSSI, and that Direct Supply failed to prove others derive gross receipts from licensing their substantially identical software to customers via download or on a disk.

### A.     Direct Supply derives gross receipts from providing access to DSSI

Once again, the United States shifts the focus away from the precise language used and, instead, makes unsupported assumptions about what customers pay for: "Where, as here, customers are not paying for access to the online software itself, but rather for some other service that the software facilitates, the third-party comparable exception does not apply."  (USA's Brief at 66).

Whether customers are paying for a service is not the proper question under a textual application of the regulations (any more than it was under a textual application of the statute itself). A textual application of the regulations requires the Court to determine whether Direct Supply derives gross receipts from providing customers access to DSSI (not to speculate about whether customers want to pay for a software product or just want to be able to order things). And the structure of Direct Supply's contracts establish that all of Direct Supply's gross receipts come from Direct Supply's grant of access to DSSI. The reason is that Direct Supply's contracts – in

return for being granted access to DSSI – *require* customers to pay Direct Supply. Direct Supply's contracts say "During the term of this Agreement, [Provider] and its Facilities will process all or substantially all procurement requirements related to [Provider's] Facilities including the category of food through [DSSI]…" (A.Sep.Appx. 30). Thus, in return for access, customers are committing to pay fees. That structure – no access without fees; fees with access – is the reason Direct Supply's gross receipts from DSSI are derived from providing access.

The United States' fears that "Direct Supply's interpretation of the third-party exception would effectively nullify the threshold requirement and swallow the rule by allowing the § 199 deduction for gross receipts derived from virtually any online service." (USA's Brief at 67). Likewise, the District Court noted "nearly every online service [provides login credentials]." (R. 61 at 16; A. Short Appx. 1). Both ignore the structure of Direct Supply's contracts. The District Court may be right that software accessed online often requires login credentials to access it. But when one registers for an Amazon account, for example, and is granted access, revenue does not necessarily flow to Amazon because the customer may or may not use the account. One can fairly say revenue is not derived from *access* to Amazon. But DSSI is very different. In order to be granted access, customers must use it for *all* of their procurement requirements. At the time a customer signs a contract with

Direct Supply and is granted access to DSSI, the customer has made the financial decision that all of its procurement requirements will generate revenue for Direct Supply. The requirement to use DSSI exclusively is what differentiates DSSI from other software accessed online, and is the reason that Direct Supply's interpretation of the third-party exception in no way swallows the rule.

### B. Others derive gross receipts from providing substantially identical software on a disk or by download; alternatively, genuine issues of fact preclude summary judgment in favor of the United States on this issue

"Substantially identical software" is defined in 26 C.F.R. § 1.199-3(6)(iv)(A) as software that, from a customer's perspective, has the same functional result as DSSI and has a significant overlap of features or purpose with DSSI. The stipulated facts are DSSI and Ariba, Basware, Ivalua, Wallmedien and Zycus all produce the same functional results from a customer's perspective. (R. 56, ¶ 71; A.Sep.Appx. 162); there is a significant overlap of purpose between DSSI and Ariba, Basware, Ivalua, Wallmedien, and Zycus. (R. 56, ¶ 72; A.Sep.Appx. 163); DSSI has an 86% overlap of features with Ariba, an 84% overlap of features with Basware, an 88% overlap of features with Ivalua, an 81% overlap of features with Wallmedien, and an 81% overlap of features with Zycus. (R. 56, ¶ 72; A.Sep.Appx. 163);

and Ariba, Basware, Invalua, Wallmendien and Zycus were all available via download in 2011-2015. (R. 56, ¶ 73; A.Sep.Appx. 163).

The United States argues that Direct Supply has not proven others derive gross receipts from a lease, rental, license, sale, exchange or other disposition of the substantially identical software even though that substantially identical software was undisputedly available via download during the relevant period. Direct Supply submitted a declaration from Justin Freeman stating:

> During the period 2011-2015, I worked with several clients who had Ariba's e-procurement software installed "on-premises" (meaning it had been downloaded to the client's own computer network). During that same period, I worked with several other clients who had Ivalua's e-procurement software installed on-premise. Both of these clients paid recurring fees to Ariba and Ivalua between 2011 and 2015 for the use of their e-procurement platforms which had been downloaded from the internet to the client's computer systems.

> (R. 43 at 10-11; A.Sep.Appx. 40).

Arguing that is not good enough, the United States says, "That declaration contained no detail about how these two companies derived revenue or how Freeman knows that they did so."  (USA's Brief at 69-70). The United States also claims Mr. Freeman was an undisclosed fact witness.

Mr. Freeman's declaration explains he worked with clients who paid fees during 2011-15 to Ariba and Ivalua for substantially identical software

they had downloaded. In arguing that this declaration does not explain how the companies derived gross receipts from a disposition of software, the United States wants it both ways. It claims Direct Supply does not license or rent DSSI because there is no disposition of software, but when confronted with software that has been downloaded and installed on-premise, the United States' denies that is a disposition either. If "disposition" means anything, downloading software and installing it on premise satisfies the definition.

The United States' argument that Mr. Freeman was "undisclosed" assumes an obligation where none existed. The United States claims Direct Supply should have disclosed Mr. Freeman's personal knowledge in response to an interrogatory. (USA's Brief at 18). The interrogatory asked Direct Supply to "describe how or in what manner the [manufacturers of substantially identical software] charged for access to, or otherwise derived gross receipts from" the substantially identical software. (A.Sep.Appx. 24). Direct Supply responded:

> Direct Supply understands and believes that during the relevant time period, all five software platforms were available via download or affixed to a tangible medium. While some or all may have also been available through the cloud during some or all of the relevant period, each manufacture of these five software products derived revenue, either from flat fees, periodic fees or transaction-based charges, for their software when it was provided to customers by download or affixed to a tangible medium.

*Id.* Direct Supply properly described "how and in what manner" other manufacturers derived revenue. The interrogatory did not ask Direct Supply to identify witnesses or how any witnesses had knowledge.

Moreover, this response came after Direct Supply had already answered Interrogatory No. 1 where it said:

> DSSI is substantially identical to virtually all e-procurement software platforms, including the "procure-to-pay" software platforms sold by Basware, SAP (Ariba), Yardi, Wax Digital, Determine, Invalua, Proactis, and Synertrade. … Each of those platforms, Direct Supply believes, was available via download or affixed to a tangible medium during each relevant year. Therefore, the companies selling those software platforms would have derived gross receipts in their businesses from the lease, rental, license, sale, exchange, or other disposition of that software, on a regular and on-going basis, from providing that software to their customers via download or affixed to a tangible medium.

(R. 60-3 at 3). The United States never asked how Direct Supply knew that.

Furthermore, the United States deposed Mr. Freeman, and knew about his personal knowledge working with clients who had downloaded these substantially identical software platforms; the United States did not choose to follow up with questions. Mr. Freeman testified:

> Q  … for now we can go to paragraph seven. And it says that, "We are aware that Ariba, Basware, Invalua, Wallmedien, Zycus were all available on

premises during the period 2011 to 2015." How are
you aware of that?

A   Because during the software evaluations we asked
the question "Would you be able to provide your
service on-prem or in the cloud?

Q   So is it based on this question that you have here,
the ability to provide a solution with a private cloud,
on-premise hosting option?

A   Yes.

Q   Is it based on any other responses?

A   My direct knowledge of working with clients that
had those systems that were on-prem and both in the
cloud.

(R. 60-2 at 3).

Direct Supply has submitted sufficient undisputed evidence to prove

others derive gross receipts from a disposition of substantially identical

software that has been downloaded. However, in the event the Court

disagrees, Direct Supply is entitled to a trial on this issue. Because the

United States moved for summary judgment denying the deduction under the

third-party comparable exception, Direct Supply was entitled to all

reasonable inferences. *Smith on Behalf of Smith v. Severn*, 129 F.3d 419, 425,

(7th Cir. 1997) ("we view the record and all reasonable inferences drawn

therefrom in the light most favorable to the non-moving party"). Because

substantially identical software was indisputably available on a disk or download during 2011-15, and individuals paid fees for that software downloaded and installed on premises during that period, it is reasonable to infer that the manufacturers derived gross receipts from those dispositions of that substantially identical software.[5]

### C.  If the United States is correct that the proper inquiry is whether customers are paying for services versus access to software, the United States was not entitled to summary judgment

Again, if the United States is correct, and the question is whether Direct Supply's customers are paying for a service (rather than whether Direct Supply derive gross receipts from providing access to software), the United States is not entitled to summary judgment under the third-party comparable exception any more than it is under the plain language of § 199. It is unlikely, but possible, that some theoretical customer exists who only wants to be able to order products with DSSI, and that customer does not give a second thought to how the software controls spend or what else it does. Most users of Amazon presumably have no interest in the features or

---

[5] In addition, Direct Supply filed a motion to supplement the summary judgment record (R. 47) to include a declaration from Marcia Alonzo of Basware (R. 48-1) attesting that Basware derived gross receipts on an ongoing basis from 2011-15 from licensing its Basware e-procurement software to customers who downloaded it from the internet. The District Court denied that motion as moot. Because Direct Supply has established it derives receipts from access to DSSI, at a minimum Direct Supply is entitled to a remand for a determination of whether it should be permitted to supplement the summary judgment record to include the Alonzo declaration.

functionality of the software that powers Amazon. But it is equally possible that customers of DSSI choose it precisely for the features and functionality of the software product. If the question is whether customers are paying for the specific software product DSSI, as opposed to only a service that lets them order products, that is a question of fact requiring a trial.

## CONCLUSION

Summary judgment in favor of the United States should be reversed. This case should be remanded with directions to enter partial summary judgment with respect to Direct Supply's entitlement to the § 199 deduction and for a determination as to the amount. Alternatively, the case should be remanded for a decision on Direct Supply's evidence establishing the third-party comparable exception or for trial.

Dated: December 8, 2023

<div style="margin-left:40%">

Respectfully submitted,

 s/ Barry R. White
BARRY R. WHITE, SBN 10202117
CHRISTOPHER E. AVALLONE, SBN 1095465
**VON BRIESEN & ROPER, S.C.**
411 East Wisconsin Avenue, Suite 1000
Milwaukee, WI 53202
Phone:  (414) 276-1122
Fax:  (414) 276-6281
Email:  Barry.White@vonbriesen.com
Christopher.Avallone@vonbriesen.com

*Counsel for Plaintiff-Appellant*

</div>

## **CERTIFICATE OF COMPLIANCE WITH Fed. R. App. P. 32(A)(7), Fed. R. App. P. 32(G) AND CIRCUIT RULE 32(C)**

The undersigned, counsel of record for the Plaintiff-Appellant, furnishes the following in compliance with Fed. R. App. P. 32(a)(7):

I hereby certify that this brief conforms to the rules contained Fed. R. App. P. 32(a)(7), as modified by 7th Cir. R. 32(c), for a brief produced with a proportionally spaced font. The length of this brief, excluding the parts of the document exempted by Fed. R. App. P. 32(f) is 6,855 words.

Dated: December 8, 2023

 s/ Barry R. White

*Counsel for Plaintiff-Appellant*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 8, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: December 8, 2023

 s/ Barry R. White

*Counsel for Plaintiff-Appellant*

40417005_1.DOCX